**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: May 03 2010

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 09-37252 |
| | ) | |
| James H. Seiler and | ) | Chapter 7 |
| Stephanie S. Seiler, | ) | |
| | ) | |
| Debtors. | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION AND ORDER REGARDING MOTION TO DISMISS

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 23] and Debtors' response [Doc. # 28]. The court held a hearing on the motion that Debtors, their counsel and counsel for the UST attended in person and at which the parties presented testimony and other evidence in support of their respective positions.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that this court may hear and determine. 28 U.S.C. § 157(b)(1), (b)(2)(J) and (O).

Having considered the briefs and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the UST's motion to dismiss will be granted.

## BACKGROUND

Debtors are married. James Seiler is fifty-seven years old and is employed by Speedy Sewer & Drain Service ("Speedy Sewer"), a family owned business in which he owns a ten percent interest and where he has worked for thirty-five years.[1] Stephanie Seiler is an office worker employed by ABC Warehouse where she has worked for twenty-two years. Although Debtors' bankruptcy schedules show that they have no dependents, their adult son and his three children, ages 15, 11 and 5, have lived with them for approximately three years. They moved in with them after Debtors' son experienced a fire at his home and went through a divorce. Debtors' son worked for Speedy Sewer but, after being laid off, has been unemployed for approximately six months.

On October 19, 2009, Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code, stating that their debts are primarily consumer debts. Debtors' Schedule D shows total secured debt in the amount of $428,783. Their secured debts include $203,460 secured by a first mortgage on their home, which they value at $200,000, $4,987 secured by a 2004 Ford Mustang, $59,152 secured by a 1999 thirty-four foot boat, and $161,184 secured by property located at 1028 Streetman, Erie, Michigan ("Streetman property"), which they value at $125,000. Debtors have surrendered the boat, which they had owned for approximately seven years, and have stated their intention to surrender the Streetman property.

Debtors' Schedule E shows unsecured priority debt in the amount of $828. Their Schedule F shows unsecured nonpriority debt in the amount of $354,842, which includes credit card debt in the amount of $130,631, debt relating to vehicles owned by Speedy Sewer and on which James Seiler is a cosigner in the amount of $81,957, and debt in the amount of $133,832 that is secured by real property used in the family business and in which James Seiler has a fifty percent interest that he values at $125,000. [*See* UST Ex. 2, Schedules A & F].

According to James Seiler, debt incurred in connection with the Streetman property is, in large part, what led to Debtors' financial troubles. In 2005, Stephanie Seiler obtained a $140,000 construction loan to have a prefabricated home built at the Streetman property for Debtors' son after his home was destroyed by a fire. Although the contractor building the home had agreed to do so for $140,000, he left the home only partially completed, requiring Debtors to invest substantial sums in order to complete the home. Debtors commenced a state court action against the contractor. However, during the time that they were pursuing litigation, Debtors depleted their savings to provide the down payment required of them to refinance the

---

[1] James Seiler testified that he has a ten percent interest in the family business and that the statement on Schedule I that he has a fifty percent interest is incorrect.

construction loan with a stated income loan obtained by Stephanie Seiler. They also incurred substantial credit card debt in an effort to complete the house and pay the debt associated with it. In the end, the contractor filed for bankruptcy and Debtors were unable to recover any of their additional costs.

In addition to their home and the 2004 Ford Mustang, Debtors' assets that are not being surrendered include a 1999 Jeep Cherokee and the 50% ownership interest in real property used in the family business. Although not included on Debtors' Schedule B, Stephanie Seiler also has an interest in a 401(k) plan that she testified has a value of $60,000, less the balance owed by her on a $30,000 loan taken by her against the plan approximately two years ago to pay some of their debts. Debtors' Schedule B also shows that funds in the amount of $3,267.20 were being held at the time of filing by Global Client Solutions through Federal Debt Reduction, Inc., for payment of debts.

Debtors' Schedule I shows gross monthly income in the combined total amount of $8,233. This amount includes $6,800 earned by James Seiler working in the family business. This figure is based upon a weekly amount that he is normally scheduled to receive. He testified, however, that, although he is supposed to draw a weekly paycheck, he has not been able to do so recently because of a shortage of funds due to a downturn in the business. For five of the first ten weeks of 2010, he received no paycheck so that other employees of the business could be paid. According to Seiler, his income has dropped each year for the past several years. In 2008, he earned $90,247. In 2009, his income dropped to approximately $82,000, and he expects to earn only $80,000 in 2010.

Debtors' Schedule I also shows gross monthly wages of Stephanie Seiler in the amount of $1,433.24. The court finds this amount understated. Stephanie Seiler testified that she works full time, earning $12.25 per hour, and that she actually earns approximately $24,000 per year, or $2,000 per month, which figure the court finds more accurately states her income and is in line with her income as disclosed in the Statement of Monthly Gross Income filed with Debtors' petition. [UST Ex. 2, p. 47].[2]

Debtors' payroll deductions, as shown on Schedule I, total approximately $3,500. Their deductions include a deduction from James Seiler's income of $295.75 as payment on a 401(k) loan. However, Mr. Seiler testified that he does not have a 401(k) plan and that inclusion of this amount as a deduction from his pay is an error. Properly included, however, is a deduction of $410.49 from Stephanie Seiler's monthly income as her 401(k) loan payment. The payroll deductions set forth on Schedule I also include a deduction for payroll taxes in the amount of $202.62 from Stephanie Seiler's income of $1,433.24, which reflects a

---

[2] Although Stephanie Seiler's income is properly disclosed for the six-month period before filing in the Statement of Monthly Gross Income, her average monthly gross income was miscalculated on that statement. [*See* UST Ex. 2, p. 47].

3

tax rate of approximately 14%. Applying this tax rate to her actual monthly income of $2,000, $300 is a more accurate estimation of her monthly payroll tax deduction. With these adjustments to Debtors' income and payroll deductions, their net monthly income after payroll deductions, totals approximately $5,498, rather that the $4,733 shown on Schedule I.

Other income not shown on Schedule I includes Debtors' 2009 income tax refunds totaling $2,100. In addition, Debtors receive approximately $375 per month from their son, who is unemployed.

Debtors' Schedule J shows total monthly living expenses of approximately $7,211. Their expenses include, among other things, a home mortgage expense of $1,670, a mortgage expense of $1,300 for the Streetman property, electricity and heat expenses of $473, a car payment of $312, boat insurance expense of $49, a food expense of $1,200, and a $141 expense for "cable," which Stephanie Seiler testified included approximately $70 for cablevision and an additional $70 for a satellite television provider. However, Debtors have not made the Streetman property mortgage payment since mid-2006 and intend to surrender that property. Also Debtors have already surrendered the boat so that boat insurance is no longer an expense. The court also notes that Debtors have filed a Reaffirmation Agreement pursuant to which they seek to reaffirm their home mortgage debt that states that the monthly payment is $1,554.82, which is approximately $115 less than the amount stated on their Schedule J.[3]  [*See* Doc. # 36].

Debtors' Form B22A calculating the means test shows that their annualized current monthly income at the time of filing this case was above the median income for a household the size of Debtors in Michigan. According to Debtors' means test calculation, no presumption of abuse arose under 11 U.S.C. § 707(b)(2). The UST filed a motion to dismiss for abuse and is now proceeding only under § 707(b)(3).

## LAW AND ANALYSIS

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Under § 707(b)(3), in determining whether granting relief would be an abuse, the court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). This provision was added by Congress in 2005 as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Before BAPCPA, courts considered

---

[3] The court takes judicial notice of the contents of its case docket. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (6th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it).

4

whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).

**I. 11 U.S.C. § 707(b)(3)(A): Lack of Honesty/Bad Faith**

The UST first argues that granting Debtors a discharge in this case would be an abuse of the provisions of Chapter 7 due to their lack of honesty in completing their bankruptcy schedules. In this court's view, the "lack of honesty" basis for finding abuse under pre-BAPCPA § 707(b) as set forth in *Krohn* has been incorporated by Congress into the determination of whether the debtor filed the petition in bad faith that is required under post-BAPCPA § 707(b)(3)(A). *In re Seeburger*, 392 B.R. 735, 740 (Bankr. N.D. Ohio 2008); *see In re Srikantia*, 417 B.R. 505, 509 (Bankr. N.D. Ohio 2009). In *Krohn*, the Sixth Circuit explained that a court should determine "from the totality of the circumstances whether [the debtor] is merely seeking an advantage over his creditors, or instead is 'honest,' in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings." *Krohn*, 886 F.2d at 126. The court articulated the following nonexclusive list of factors that may be relevant: (1) the debtor's good faith and candor in filing schedules and other documents, (2) whether the debtor has engaged in "eve of bankruptcy purchases," and (3) whether he was forced into Chapter 7 by unforeseen or catastrophic events. *Id.*

While the court is troubled by the inaccuracies in Debtors' bankruptcy schedules, the court does not believe that they were intentional but, rather, finds they were inadvertently made. For example, Debtors' Statement of Financial Affairs does not disclose Speedy Sewer as a business in which James Seiler is an officer or director, and Schedule B does not disclose Mr. Seiler's ten percent interest in Speedy Sewer. However, his ownership interest, although at a greater percentage than he actually owns, and the fact that he is president of the company is disclosed in Schedule I. Similarly, although Debtors' Schedule B does not include Stephanie Seiler's interest in her 401(k) plan and her Schedule I understates her income, the fact that she has an interest in a 401(k) plan is made obvious on her Schedule I, which sets forth her 401(k) plan loan payment, and her income is more accurately stated in the Statement of Monthly Gross Income filed

5

with Debtors' petition and her payment advices for the six month period before filing that were filed in conjunction with the petition. These facts lead the court to believe that the inaccuracies in Debtors' schedules, including the failure to include funds contributed by their son to pay monthly expenses, were inadvertent rather than intentional.

Moreover, the court is concerned that predicating dismissal under § 707(b)(3) on schedule inaccuracies alone would conflict with the more stringent standard chosen by Congress in 11 U.S.C. § 727(a)(4) for denial of discharge based upon knowingly and fraudulently making a false oath in connection with a Chapter 7 case. Denial of discharge under § 727(a)(4) requires the commencement of an adversary proceeding, which has not occurred. Fed. R. Bankr. P. 7001(4). The UST's proof regarding schedule inaccuracies does not demonstrate by a preponderance of the evidence knowing *and* fraudulent falsehoods by Debtors.

In any event, having considered the evidence and testimony of Debtors, the court is instead left with the belief that they filed their bankruptcy petition in good faith. Debtors' bankruptcy was precipitated by their attempt to deal with a family tragedy – their son's divorce and the loss of his home in a fire – together with a downturn in the family business and a resulting diminished income. James Seiler's income had decreased significantly over the period of time during which Debtors experienced unforeseen complications regarding the Streetman property, which ultimately led to them incurring debt that became burdensome. There is no evidence that Debtors have attempted to take advantage of creditors by engaging in eve of bankruptcy purchases or have otherwise attempted to take unfair advantage of the provisions of the Bankruptcy Code such that the court could conclude that they filed their petition in bad faith.

## II. 11 U.S.C. § 707(b)(3)(B): Totality of Debtors' Financial Circumstances

The UST also argues that the totality of the circumstances show that Debtors are not needy and that they have the ability to repay a meaningful portion of their unsecured debt. A debtor is "needy" when "[their] financial predicament warrants the discharge of [their] debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone is sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *In*

6

*re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge,* 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn*, 886 F.2d at 126.

In arguing that Debtors are not needy and have the ability to pay a meaningful portion of their unsecured debt, the UST asserts that deductions from Stephanie Seiler's income for monthly 401(k) plan loan payments should be considered income available to fund a Chapter 13 plan. In determining whether voluntary contributions to retirement plans and repayment of loans to retirement plans are a reasonably necessary expense, the court must consider the totality of the debtor's financial circumstances. *See Behlke*, 358 F.3d at 435-36 (considering the fact that the debtors had accumulated retirement savings as well as other personal and real property of potentially significant future value and finding substantial abuse where debtors' 401(k) contributions in the amount of $460 per month were not necessary for the maintenance and support of the debtors or their dependents); *In re Tucker*, 389 B.R. 535, 540-41 (Bankr. N.D. Ohio 2008) (addressing the precedent established by *Behlke* and concluding that it, as well as the plain language of § 707(b)(3), requires consideration of the totality of the debtor's individual circumstances in determining whether a debtor's 401(k) contributions are reasonably necessary); *In re Beckerman*, 381 B.R. 841, 848-49 (Bankr. E.D. Mich. 2008); *In re Gonzalez*, 378 B.R. 168, 174 (N.D. Ohio 2007). As one court stated, "[t]here is little reason for a 'fresh start' that will only be answered with a substantial incapacity to provide for oneself at retirement." *In re King*, 308 B.R. 522, 531 (Bankr. D. Kan. 2004). Therefore, debtors may seek bankruptcy relief while voluntarily saving for retirement if such savings appear reasonably necessary for the maintenance or support of the debtor or the debtor's dependents. *Hebbring v. U.S. Trustee*, 463 F.3d 902, 907 (9th Cir. 2006). Factors relevant to this determination include: (1) the debtor's age and time left until retirement; (2) the amount of the debtor's existing retirement savings; (3) level of yearly income; (4) overall budget; (5) amount of monthly contributions; (6) needs of any dependents; and (7) other constraints that make it likely that retirement contributions are reasonably necessary expenses for this particular debtor. *In re Beckerman*, 381 B.R. at 848 (citing *Hebbring,* 463 F.3d at 907, *In re Taylor,* 243 F.3d 124, 129-30 (2d Cir. 2001)).

In this case, Debtors' household income is above the median income. Stephanie Seiler has accumulated retirement savings of approximately $60,000, less the amount owed on her loan of $30,000. James Seiler testified that he does not have a 401(k) plan and the record is silent as to any other retirement savings that he may have. Other assets that may enhance their retirement include their home, in which they have no equity at this time, and real estate used in the family business. The UST offers no evidence as to what level of savings is necessary to reasonably provide for oneself in retirement. Debtors' retirement,

7

while not imminent, is at least a concern given their ages and the level of their retirement savings, which amount the court does not find to be exorbitant. Mrs. Seiler's monthly 401(k) plan loan payment is approximately 4.5% of Debtors' income, which amount is not unreasonable. *See In re Tucker*, 389 B.R. at 541 (finding that debtors' monthly 401(k) contribution of approximately $135, or less than 2.5% of his income, and his 401(k) loan repayment of $234, or approximately 4% of his income, were neither extravagant nor unusual). While the court presumes that Debtors will be entitled to Social Security payments at their retirement, the UST offers no evidence of any other retirement income that will be available to them. The court cannot conclude from the record before it that, given Debtors' ages and minimal retirement savings, the modest amount being paid by Stephanie Seiler as a repayment of her 401(k) plan loan are not reasonably necessary expenditures. As the court stated in *Tucker*, "abuse of the provisions of Chapter 7 implies 'some sort of action that crosses over a line of appropriateness. It permits consideration of surrounding factors so that abusive use of repayment of retirement plan loans and additional contributions to retirement plans can be separated from legitimate uses.'" *Id.* at 540 (quoting *In re Vansickel*, 309 B.R. 189, 209 (Bankr. D. Kan. 2004)). In this case, the record before the court does not support a finding that the 401(k) plan loan payments are abusive.

The UST also asserts that there are several ways in which Debtors can trim their Schedule J budget to make funds available to their pay unsecured creditors. Debtors' income after payroll deductions in the amount of $5,498, as adjusted above, plus their son's monthly contribution of $375, totals $5,873. This income, less their Schedule J expenses of $7,211, results in a shortfall of $1,338. However, in assessing Debtors' ability to pay, the court is not required to accept all of the expenses as stated in their schedules. Rather, in evaluating the totality of the circumstances of Debtors' financial situation, the court must consider whether living expenses can be reduced significantly without depriving Debtors or their dependents of adequate food, clothing, shelter, and other necessities. *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge*, 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn,* 886 F.2d at 126.

In evaluating the totality of the circumstances, the court has considered the fact that Debtors have made meaningful attempts to decrease their expenses by surrendering both their boat and the Streetman property. Nevertheless, they have included expenses totaling $1,349 for boat insurance and the Streetman property mortgage in their Schedule J budget. As Debtors will not be paying these expenses in the future, the expenses need not be part of their budget going forward.

Also, Debtors' reaffirmation agreement relating to their home mortgage shows a mortgage expense that is $116 less than the amount on Schedule J. The UST also asserts that expenses paid for both cable and

8

satellite television are not necessary. The court agrees. Eliminating one of those expenses would make an additional $70 per month available to pay unsecured creditors. With only the modifications discussed above, Debtors' monthly budget will yield approximately $200 per month that could be applied to their unsecured debt. Having reviewed their Schedule J expenses, which include a $1,200 per month food expense, the court believes that additional belt-tightening can occur that would result in a significant amount of additional funds being available without depriving Debtors or their dependents of adequate food, clothing, shelter and other necessities. With such belt-tightening, and also considering Debtors' income tax refund of $2,100, the court is confident that Debtors could apply a total of $500 per month to their unsecured debt.

The court has also considered the fact that Stephanie Seiler obtained the loan from her 401(k) plan approximately two years ago. The repayment period for 401(k) plan loans is generally no longer than five years. *See* 26 U.S.C. § 72(p)(2)(B) (requiring such loans to be repaid within five years unless the loan is used to acquire the participant's principal residence). Assuming that Mrs. Seiler's loan will be paid off within three years, the $410 being withheld from her monthly pay in order to make her loan payments could then be applied to payment of Debtors' unsecured debt.

In determining whether granting Debtors relief under chapter 7 would be an abuse, the court has also considered Debtors' eligibility for adjustment of their debts through Chapter 13. Debtors are eligible if their income is sufficiently stable and regular to enable them to make payments under a Chapter 13 plan and if their debts are less than the statutory eligibility limits. *See* 11 U.S.C. §§ 109(e), 101(30). Although James Seiler has experienced a decrease in his income, Debtors still have relatively stable employment and regular income. Debtors' secured debts fall within the statutory eligibility limits, but, according to Debtors' Schedule E and F, their noncontingent, liquidated unsecured debts total $355,671.48, which amount exceeds the $336,900 maximum for Chapter 13 eligibility.[4] *See* 11 U.S.C. § 109(e). However, Debtors include as unsecured debt on Schedule F $133,832 owed to National City Bank, which debt is secured by property used in the family business and in which he owns a fifty percent interest. Because his ownership interest is property of the bankruptcy estate, the debt is secured to the extent of that interest, which he values at $125,000. *See* 11 U.S.C. § 506(a) (providing that an "allowed claim of a creditor secured by a lien on property *in which the estate has an interest* . . . is a secured claim to the extent of the value of *such creditor's interest in the estate's interest in such property* . . . and is an unsecured claim to the extent that the value of

---

[4] Although this eligibility limit has been increased effective April 1, 2010, the increase does not apply to cases filed before that date. *See* 11 U.S.C. § 104(c).

9

such creditor's interest . . .is less than the amount of such allowed claim"). Thus, only $8,832 of the total debt of $133,832 is unsecured. *See id.; In re Fuson*, 404 B.R. 872, 876 (Bankr. S.D. Ohio 2008) (finding that a debt is unsecured for purposes of determining eligibility for Chapter 13 relief to the extent that it is secured by property in which the debtor has no interest); *In re Tomlinson*, 116 B.R. 80, 82 (Bankr. E.D. Mich. 1990) (same). With this adjustment, and adding that portion of their Schedule D secured debt that exceeds the value of their collateral, Debtors' unsecured debt totals approximately $270,315, which amount falls within the statutory eligibility limits. *See In re Groh*, 405 B.R. 674 (Bankr. S.D. Cal. 2009); *In re Fuson*, 404 B.R. at 875-76; *In re Bowes*, No. 08-36417, 2009 WL 2983036, 2009 Bankr. LEXIS 2884 (Bankr. N.D. Ohio Sept. 14, 2009). *But see In re Holland*, 293 B.R. 425, 428 (Bankr. N.D. Ohio 2002).

As discussed above, Debtors have the apparent ability to apply approximately $500 per month to fund a Chapter 13 plan. Over a sixty-month minimum plan duration for above-median debtors, as would be required in this case, *see* 11 U.S.C. § 1322(d)(1), they would have approximately $27,070 available after payment of the Chapter 13 Trustee's administrative expenses and their priority unsecured debt to pay their remaining unsecured debts. The court notes that $90,789 of the total unsecured debt is business debt relating to vehicles owned by Speedy Sewer and the real property used by the business. Although James Seiler is a co-obligor on those debts, Speedy Sewer is presumably paying them, as Debtors do not include any of the business debts on their Schedule J. If Debtors provide that the business debt will be paid by Speedy Sewer outside of a Chapter 13 plan and apply their plan payments to their remaining unsecured debts, those creditors could potentially receive a dividend of approximately fifteen percent. *See In re Behlke,* 338 F.3d 429, 437 (6th Cir. 2004) (finding *substantial* abuse where debtors had the ability to pay at least a fourteen percent dividend to their unsecured creditors). If after Stephanie Seiler pays off her 401(k) plan loan, which will likely occur within a Chapter 13 plan's five year applicable commitment period, Debtors increase their monthly plan payment by the $410 used to make that loan payment, the dividend to unsecured creditors could increase to approximately twenty percent.

The availability of debtors' remedies under state law and the relief that might be afforded through private negotiations with creditors are other factors the Sixth Circuit has identified as relevant in deciding whether it would be an abuse to grant a Chapter 7 discharge in a particular case. There is some evidence that Debtors attempted to engage in private negotiations with their creditors.[5] However, there is no evidence regarding the relative success of these negotiations in addressing Debtors' financial issues, and the record

---

[5] Debtors Schedule B shows that $3,267 was being held by Global Client Solutions for payment of debts through Federal Debt Reduction, Inc.

is otherwise silent regarding this factor. As the United States Trustee bears the burden of proof on the motion, *In re Wright*, 364 B.R. 640, 643 (Bankr. N. D. Ohio 2007), the court will assume that there are no such state law remedies or private negotiations that will assist in resolving Debtors' financial problems.

Nevertheless, on balance, the court finds that granting Debtors relief under Chapter 7 of the Bankruptcy Code would be an abuse of the provisions of that chapter given the following financial circumstances: (1) Debtors have stable, regular, above median income; (2) they are eligible for Chapter 13 relief if they choose to seek such relief; (3) they have the ability to reduce their expenses as stated on their Schedule J without depriving themselves of any necessity; and (4) they have the ability to repay a meaningful portion of their unsecured debt.

**THEREFORE**, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Debtors are allowed twenty-eight (28) days from the date of this order to file a motion to convert to a Chapter 13 case, absent which the Motion of the United States Trustee to Dismiss for Abuse Pursuant to 11 U.S.C. § 707(b)(1) and (b)(3) [Doc. #23] will be granted, and this case will be dismissed, by separate order of the court.